John C. Grant and Louise B. Grant v. Commissioner.
Grant v. Commissioner
Docket No. 62989.
United States Tax Court
T.C. Memo 1959-137; 1959 Tax Ct. Memo LEXIS 108; 18 T.C.M. (CCH) 601; T.C.M. (RIA) 59137; June 30, 1959
*108 Held: 1. In the return for 1950 and for 1951 petitioners omitted from gross income an amount of includible income which was in excess of 25 per cent of the gross income reported; therefore, under section 275(c), the 5-year period of limitation applies and deficiencies for those years are not barred. 2. Earnings of a corporation which are distributed to the individual who has complete dominion and control over the corporation's funds are taxable to the recipient even though the corporation was organized without authorized stock. 3. The management, operations, and receipts of a nonprofit, Ohio corporation which operates a bar and serves food, were under the dominion and control of John C. Grant during 1950-1952, and since he failed to prove that the corporation's net income was not received and used by him as respondent determined, respondent's determination that the corporation's income is taxable to him under section 22(a) is sustained. 4. Respondent has failed to show by clear and convincing proof that part of the deficiency for each year was due to fraud with intent to evade tax under section 293(b). Rex E. Sager, Esq., Second National Building, Akron, Ohio, and Scott A. Belden, *109 Esq., for the petitioners. William O. Allen, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined deficiencies in income tax and 50 per cent additions under section 293(b) of the 1939 Code for the years 1950-1952, inclusive, as follows: Year
Deficiency
Sec. 293(b)
1950
$ 4,731.14
$2,365.57
1951
9,903.92
4,951.96
1952
12,344.28
6,172.14
The questions are as follows: (1) Whether income of a corporation, The Welcome Social Benefit Club (which is claimed to be exempt from income tax), for each of the taxable years is includible in petitioners' income under section 22(a) of the 1939 Code. (2) Whether petitioners omitted from gross income for 1950 and 1951 an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in the return so that the 5-year period of limitation provided in section 275(c) applies. (3) Whether any part of a deficiency is due to fraud with intent to evade tax within the scope of section 293(b). Findings of Fact The petitioners were residents of Akron, Ohio during the taxable years. They filed joint returns with the collector of internal revenue for the eighteenth district *110 of Ohio. Since the issues relate primarily to John C. Grant, he is referred to hereinafter as the petitioner. The petitioner stated in the returns filed for the taxable years that his occupation was steward, and that he was employed in each year by The Welcome Social Benefit Club in Akron, Ohio. He reported the receipt of wages from the Club in the amounts of $1,510 for 1950, $2,955 for 1951, and $2,650 for 1952. The petitioners reported in their returns, also, the receipt of rents from three pieces of real estate located in Akron, Ohio, having the respective addresses, 419 Wooster, 798 Rhodes, and 822 Rhodes. However, a net loss in each year was reported for these rental properties; $2.67 in 1950; $328.54 in 1951; and $789.21 in 1952. Petitioners reported in their returns gross and net income as follows: Gross
Net
Year
Income
Income
1950
$1,510.00
$1,507.33
1951
2,955.00
2,626.46
1952
2,729.10
1,939.89
On April 11, 1928, a corporation called The Welcome Social Benefit Club was organized as a nonprofit and nonstock corporation under the laws of Ohio. Petitioner was one of the organizers of the corporation and he has been closely associated with it at all times. The corporation is referred to hereinafter *111 as the Club. The purposes for which the Club was incorporated were stated in its articles of incorporation to be as follows: "not for profit, but to own, maintain and conduct a social literary club in the City of Akron, Summit County, Ohio; to lease, purchase and maintain suitable real estate and buildings for said purpose; to receive, hold and disburse donations, bequests and other funds for the purpose of said corporation and to do all things necessary and incident thereto." At some time after the organization of the corporation and many years before 1950, the Club obtained from the State of Ohio a "4-D" license to sell liquor, which type of license is issued to private social clubs under Ohio law. Since 1940, the Club has operated a restaurant and bar. In 1940 or 1941 the Club moved to premises located at 822 Rhodes Street in Akron, and it has been located there ever since. At about the same time that the Club moved to the above address, petitioners purchased the property which is still owned by them. Title to the property has been held at all times in the name of petitioner's wife, Louise. The Club has paid rent to petitioner for occupancy of part of the premises. The Club paid *112 rent during the taxable years to the petitioner in the amount of $75 a month, or $900 a year. Petitioners reported the above amount of rent received in their returns for 1950-1952, inclusive. The Club occupied only part of the premises during the taxable years, another part being occupied by a barbershop, which is referred to hereinafter. The Club has never filed any Federal income tax return. It has taken the position at all times that it was exempt from Federal income tax on corporations under section 101(9) of the 1939 Code as a club organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, and that no part of its net earnings inures to the benefit of any private shareholder or individual. However, The Welcome Social Benefit Club has never established that it is a tax-exempt corporation by filing an affidavit to that effect, or any other document, with the collector of internal revenue for the district in which it is located, as is required by the provisions of section 29.101-1 of Regulations 111. The corporation never received any ruling from the Commissioner of Internal Revenue that it was exempt from income tax in any particular year. No information *113 returns have ever been filed by the corporation with the Commissioner on Form 990, as is required by the above regulation. During the taxable years and for many earlier years, petitioner was the manager of the Club. He held the office of secretary during the taxable years. A minute book of the Club has been maintained through the years. It contains typewritten copies of the minutes of meetings which purportedly were held, and the minutes show the election of officers and trustees. There is a book which purports to show alphabetically the names of members of the Club. In form, at least, membership cards were issued. Minutes show the election in 1950 and the reelection in 1951 and 1952 of the following officers and trustees of the Club: Office
Name
President
Fred McCray
Treasurer
Thomas Finley
Secretary
John C. Grant
Trustee
Louis R. Bragg
Trustee
James Board
Trustee
Henry Munford
The above officers and trustees of the Club were mere figureheads with the exception of Grant who controlled and managed all of the activities and operations of the Club, made decisions, and received all of the funds of the Club, which he kept under his dominion and control at all times. Although no bylaws were introduced, *114 the minutes of the meetings of members indicate that meetings were usually held on the first Sunday of each month, but the minute book shows that only 10 meetings were held in 1950; 12, in 1951; and 11, in 1952. The minutes were prepared in longhand by Grant who gave them to Daniel F. McGowan who had them typed. Grant signed the typed copies of minutes as secretary. The form of the text of the minutes followed the same pattern throughout. In many instances, the minutes stated that certain members and officers had attended a meeting, but in fact such individuals did not attend such meeting. The minutes refer, in several instances, to a social committee and a welfare committee of the Club. Neither committee existed. The minutes of the purported meetings of members and officers of the Club during the years 1950-1952, inclusive, were, to a large extent, false. Although Grant received and controlled all of the funds of the Club, he did not render any accounting to the officers and trustees, or to the members. Finley, who held the office of treasurer, did not keep the accounting records of the Club; he did not prepare a treasurer's report; and he did not audit such accounting records as *115 were maintained by Grant. McCray, who held the office of president, did no more than sign the annual application for the renewal of the liquor license held by the Club. That application was also signed by Board, one of the trustees. With the exception of Grant, the elected officers and trustees performed none of the duties which are ordinarily performed by the officers and trustees of an organization. Membership cards were printed each year. These cards were issued to individuals who came to the door of the Club for a charge of 10 cents, and the possession of a card was a requirement for entrance to the Club premises. There was a sign near the entrance to the Club which stated that a private club was located on the premises. The door to the Club was kept locked, and on weekends a doorman employed by the Club was present. He was instructed to admit only individuals who presented a membership card, but anyone who desired to enter the Club who did not have a membership card could purchase one from the doorman for 10 cents, only, and such person did not have to enter his name in a membership book. The doorman did not keep a record of the names of the individuals to whom he issued membership *116 cards. On the whole, the membership cards which were issued for 10 cents were cards of admission to the premises of the Club which could be used throughout a year. Agents of the respondent who were assigned to investigate the operations of the Club purchased membership cards at the entrance but did not give the doorman their names and addresses and they observed that no record was made of the issuance of membership cards to them. At all times material a restaurant and bar was operated on the Club premises where hamburgers, sandwiches, and other easily prepared food was served, and soft drinks, beer, wine, and liquor. Grant tended the bar. Finley assisted Grant on busy nights, usually weekends. One waitress was employed. There were three large rooms on the first floor of the Club. The bar was located in one room; and at one end of the same room, food was prepared. The other two rooms contained chairs and tables. Rooms of the Club were rented for private parties. The Club derived $220 from such rental in 1950, and $458 in 1952. No rental receipts were shown in the Club's books for 1951. The bar contained a television set. In another room there was a juke box. Dancing was permitted, *117 but as the Club hired no orchestra during the years in issue, music for dancing was provided by playing records. During the week, there was no doorman and the entrance at times was left unlocked. The Club's books show the receipt of socalled dues in the amounts of $927 in 1950 and $826.75 in 1952. The books did not show the receipt of "dues" in 1951. There are local regulations in Ohio, or Akron, which fix the closing hours of private clubs having a liquor license and restrict sales of liquor to members of a private club. The Club was cited several times for violating such regulations by serving liquor to nonmembers and staying open beyond hours. There was a cash register located in the bar of the Club. The tapes from this register were removed each day by Grant and taken to his office on the Club premises. The cash was removed from the register by Grant. There was a safe in Grant's office. Grant was the only person who ever had access to this safe. The cash register tapes were not retained. Grant kept cash day books for the Club, in which he made daily entries of receipts and disbursements. Under the headings, beer, pop, groceries, wines, cigars, and whiskey, entries were made of *118 cash paid out for purchases of such supplies. The columns were totaled each week. Periodically Grant gave this book to Daniel F. McGowan, an accountant, who prepared monthly summaries of cash receipts and disbursements. The excess of receipts over disbursements, if any, was placed to the far right of each page and added to a surplus that was brought forward. The Club's books showed a surplus of $2,484.26 on January 1, 1950, and a surplus of $9,505.90 on December 31, 1952. The accumulated amount of the net receipts, surplus, as shown in the Club's books was not deposited in any bank account. Grant has not divulged where he kept, or keeps, the accumulated cash of the Club. The Club's books show the following total receipts and disbursements for 1950, 1951, and 1952: 1950
1951
1952
Receipts
Dues
$ 927.00
0
$ 826.75
Bar and restaurant
3,307.58
$10,543.57
11,852.64
Rent
220.00
0
458.00
Total receipts
$4,454.58
$10,543.57
$13,137.39
Expenditures
Rent and utilities
$1,397.82
$ 1,185.72
$ 1,296.07
Salaries
2,680.00
5,065.00
4,585.30
Orchestra
0
0
127.50
Welfare Committee
200.00
200.00
300.00
Social Committee
100.00
258.71
300.00
Painting and wall washing
0
175.00
182.00
Licenses and taxes
576.28
653.58
666.60
Supplies
241.05
389.25
646.17
Linoleum and floors
0
0
397.00
Loan
0
1,175.00
0
Capital expenditures
0
455.21
591.50
Miscellaneous expenses
35.00
208.40
473.81
Total expenditures
$5,230.15
$ 9,765.87
$ 9,565.95
Net income (loss) per books
($ 775.57)
$ 777.70
$ 3,571.44
*119 Grant made or directed the making of some entries for expenditures which could not be substantiated and which were fictitious. The ficitious entries totaled $300 for 1950; $458.71 for 1951; and $727.50 for 1952. They purported to be expenditures to nonexistent welfare and social committees as well as for the hiring of an orchestra. In reconstructing receipts and expenditures of the Club, respondent's agent omitted these entries in arriving at net income of the Club in each year. The petitioners have agreed that the net income of the Club as reconstructed by the agent after issuance of the 90-day letter is proper. Daniel F. McGowan, who assisted Grant in keeping the Club's books of account and in having minutes of purported Club meetings typed, formerly practiced law (before he was disbarred), and from 1944 to 1949 he was a contract examiner in the General Accounting Office of the Government. He has not had training in accounting or tax work, but he engages in accounting and tax work. He is not of the colored race, and he was not associated with the Club which is restricted to those of the colored race. McGowan did not receive payment for his services to Grant, but once a year, prior *120 to the time for filing income tax returns, he was given space at the Club where he prepared income tax returns for those who came to the Club, for which he made a charge. Also, he solicited the work of preparing income tax returns among those who came to the Club. Grant did not give McGowan any original records of receipts and disbursements such as cash register tapes, invoices, and receipts, and McGowan did not examine such material, or verify Grant's figures. McGowan did not audit the books maintained by Grant. He merely totaled the items in the daily record, or made other entries as instructed by Grant. The Club maintained a checking account and a savings account in the First-Central Trust Co. of Akron. The savings account had an opening balance of $110.37 on January 1, 1950, and a closing balance of $110.67 on December 31, 1952. There were no deposits in or withdrawals from the savings account during the years 1950-1952, inclusive. The increase of 40 cents represented interest. The only person authorized to make withdrawals from the savings account was Grant. There was very little use of the checking account. There were only 13 deposits and 19 withdrawals during the period December *121 16, 1941, through February 26, 1957. During the years 1950-1952, inclusive, there were no deposits or withdrawals. The balance in the account during these years was $97.42. The signatures of both Grant and Thomas Finley were required for making withdrawals. The Club kept no records other than those mentioned above. No record was maintained of the payment of dues by members. The Club kept no record of distributions of money or commodities, if any, or of the names of the recipients of gifts, if any, or of how much, if any, was spent for charitable purposes. The Club gave some baskets of food to needy persons at Christmas time each year, but no record was kept of the expenditures for such distributions, or of the names of the recipients, or of whether members or nonmembers received the baskets of food. At some time prior to August 8, 1949, an examination was made by the Department of Taxation of Ohio. It was determined that the Club had total taxable sales of $69,047.81 for the period under investigation; that the sales tax of 3 per cent was in the amount of $2,071.43 before a credit for $570, which had been paid; that there was a sales tax deficiency in the amount of $1,501.43, to which *122 was added a penalty of $225.21; and that the total amount due was $1,726.64. On August 8, 1949, the sum of $1,041.26 was paid on the sales tax deficiency by a check drawn on the Club's checking account. The balance, $685.38, was paid on January 27, 1950, by a check of the Club's attorney, Scott A. Belden. Neither payment is shown on the Club's books. The sum of $570 represents a 3 per cent tax on sales in the amount of $19,000. The Club failed to report sales in the amount of $50,047.81. As stated above, the petitioners rented most of the premises at 822 Rhodes Street to the Club, and reported the rent received in their returns. But they did not report rent received from Louis Roosevelt Bragg who leased one room where he operated a barbershop. Bragg paid rent to petitioners in the amount of $480 in 1950, and $600 in each of the years 1951 and 1952. The cash book of the Club shows a disbursement in 1951 in the amount of $1,175. In the book of monthly totals, there is an entry in 1951, "Loan, $1,175." Grant instructed McGowan to make the entry. No note was given to the Club, or Grant; no interest was paid; and there has never been repayment of the above amount. There is no entry in *123 the Club's books showing a loan receivable from any individual in the above amount. There was no evidence showing a debtor-creditor relationship in respect to this item either between the Club and Grant, or between the Club and any other person. In 1951, Grant appropriated $1,175 for his own use out of the Club's funds. He did not consult any officer or trustee of the Club about the withdrawal, and no one gave approval. In determining the deficiencies, the respondent included in the income of the petitioners amounts for the net income of the Club which he then computed at $18,308.48 for 1950, $27,631.28 for 1951, and $31,263.46 for 1952. After the issuance of the statutory deficiency notice and before the trial of this case, respondent was able to make a further analysis of the gross receipts and expenditures of the Club. It resulted in computations of lower amounts as the Club's net income, namely, $11,681.12 for 1950, $14,342.42 for 1951, and $16,094.11 for 1952. The petitioners have stipulated that these amounts are the proper amounts for the Club's net income for the purposes of this case. The respondent determined in the deficiency notice that petitioners received and failed to *124 report additional amounts of rent, namely, $2,340 for each of the years involved. Respondent has stipulated that this determination was excessive and that the correct amounts of unreported rent are $480 for 1950, and $600 for each of the years 1950-1952, inclusive. Respondent's determination relating to the amounts of unreported rent were incorrect and excessive to the extent of $1,860 for 1950, and $1,740 for each of the years 1951 and 1952. Respondent's determination of the amount of the Club's net income was incorrect and excessive to the extent of $6,627.36 for 1950, $13,288.86 for 1951, and $15,169.35 for 1952. The following schedule sets forth the stipulated amounts of the Club's net income and of the unreported rent for each year, and the excessive amounts of such items for each year, as originally determined: Stipulated
Excessive
Year
Amounts
Determination
Club's Net Income
1950
$11,681.12
$ 6,627.36
1951
14,342.42
13,288.86
1952
16,094.11
15,169.35
Rent Received
1950
$ 480.00
$ 1,860.00
1951
600.00
1,740.00
1952
600.00
1,740.00
$43,797.65
$40,425.57
When respondent reexamined the cash books of the Club for the years 1950-1952, inclusive, after the statutory deficiency notice had been issued, he found *125 that the entries showing the amounts expended for beer, wine, liquor, soft drinks, cigars, and groceries would yield a larger amount of gross receipts applying the standard mark-up used in operating a restaurant and bar than the total amounts of receipts entered in the books. Applying the standard mark-up, respondent determined that the gross receipts for the taxable years from the sale of commodities and liquor normally would amount to $27,808.17 for 1950; $36,431.61 for 1951; and $38,322.53 for 1952. Since the Club received payments for membership cards, called dues, and rent for the use of Club rooms, the respondent added the receipts shown on the books from these sources to the above gross receipts and arrived at amounts of total income of the Club as follows: $28,955.17 for 1950; $36,431.61 for 1951; and $39,607.28 for 1952. Allowing for cost of goods sold, cost of supplies, expenses, and depreciation, the respondent determined that the net income of the Club for the years involved amounted to $11,681.12 for 1950; $14,342.42 for 1951; and $16,094.11 for 1952. The following schedule shows the respondent's reconstruction at the time of the trial of this case of the gross and net *126 income of the Club for the taxable years. On the basis of such reconstruction, it has been stipulated that for the purposes of this case, the respondent's reconstruction of the net income of the Club is correct. The following schedule shows in detail the respondent's present reconstruction of the Club's net income: 1950
1951
1952
Cost
Mark-up
Cost
Mark-up
Cost
Mark-up
1 1/2-1 Beer
$7,282.27
$10,923.41
$7,727.75
$11,591.63
$8,766.74
$13,150.11
1 1/4-1 Pop
324.70
405.88
520.27
650.34
474.96
593.70
1 1/2-1 Wine
45.85
68.78
35.51
53.27
45.86
68.79
1 1/4-1 Cigars
486.75
608.44
529.91
662.39
677.44
846.80
2-1 Groceries
1,341.33
2,682.66
1,348.83
2,697.66
820.08
1,640.16
3-1 Whiskey
4,373.00
13,119.00
6,925.44
20,776.32
7,340.99
22,022.97
Total Mark-up
$27,808.17
$36,431.61
$38,322.53
Rent, per books
220.00
0
458.00
Dues, per books
927.00
0
826.75
Total income
$28,955.17
$36,431.61
$39,607.28
Less: Cost of goods sold
$13,853.90
$17,087.71
$18,126.07
Supplies, per books
241.05
389.25
646.17
Other expenses
3,179.10
4,602.91
4,679.28
Depreciation
0
9.25
61.65
Total deductions
$17,274.05
$22,089.12
$23,513.17
Net income of Club
$11,681.12
$14,342.49 *
$16,094.11
Fred McCray was president of the Club in *127 name only during the years involved. He did not attend any meetings during the period 1950-1952. He did not receive any reports from Grant about the financial condition of the Club; he was not consulted about the expenditures of the Club's funds by Grant and he did not give approval of such expenditures; he did not give approval of any alleged loans of the Club's funds; he did not have access to the safe where Grant claims to have kept the funds of the Club and he does not know the amount of money, current and accumulated, which the Club had on hand during any of the years involved. McCray did not have any control over the Club's funds, and he knew nothing about its financial condition or its financial records. Louis R. Bragg, who was listed as a trustee during the years involved, did not know that he was a trustee and he did not exercise any of the powers or perform any of the duties of a trustee. James Board, who was listed as a trustee, was in a sanitarium during 1951. He attended not more than two meetings of the Club in 1950 and 1952. He did not perform any of the duties of a trustee other than to sign, with McCray, the liquor license renewal application each year. The Club is *128 located in a neighborhood which is predominantly colored. Grant and his associates are members of the colored race. Grant, who was born in North Carolina, is over 62 years of age. His education ended after the fifth grade of a grammar school in North Carolina. Grant and his wife have lived in Akron since 1918. Grant was engaged in some business enterprises since before 1928. He operated a poolroom in Akron at one time. Grant reads poorly and has limited knowledge of how to keep accurate and proper accounting records. He believed that the income of the Club was exempt from tax. The Club's accounting records were kept in a simple manner. No ledger was kept. The accounting records for the taxable years were incomplete and inaccurate. They did not record the entire gross receipts of the Club. The net income of the Club for 1950, after allowing for the payment on January 27, 1950, of a deficiency in the Ohio sales tax in the amount of $658.38 was $11,022.74. Grant exercised complete dominion and control over all of the receipts and the net income of the Club during the years 1950-1952, inclusive. The net income of the Club for those years is properly includible in Grant's taxable income *129 as follows: $11,022.74 for 1950; $14,342.42 for 1951; and $16,094.11 for 1952. Petitioners omitted from their gross income for 1950 and 1951 an amount properly includible therein which was in excess of 25 per cent of the amount of the gross income which was stated in each return. The return for 1950 was filed March 15, 1951; for 1951, March 17, 1952; and for 1952, March 16, 1953. The notice of deficiency was mailed to petitioners on March 13, 1956. Opinion The chief question is whether the net income for the years 1950-1952 of The Welcome Social Benefit Club is taxable to the petitioner, John C. Grant, under section 22(a) of the 1939 Code. There is also the question whether any deficiency is due to fraud with intent to evade tax under section 293(b). Before considering these questions it is necessary to determine whether a statute of limitations is a bar to the determination of a deficiency for 1950 and 1951. If a false or fraudulent return was filed, or if there was omission from gross income of an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in the return, a deficiency for 1950 and for 1951 is not barred. See sections 276(a) *130 and 275(c). [1] Respondent has the burden of proof under this question. . It is concluded that under section 275(c) the 5-year period of limitation applies to the returns filed for 1950 and 1951, which were filed within 5 years before the statutory deficiency notice was issued. Petitioner failed to include in his gross income for 1950 rent received from Bragg for the barbershop space in the amount of $480, which is more than 25 per cent of the gross income which was reported. Petitioner failed to include in his gross income for 1951, rent received from Bragg in the amount of $600 and the sum of $1,175 of income of the Club for 1951, a total amount of $1,775, which is more than 25 per cent of the gross income reported for 1951. It is held that deficiencies for 1950 and 1951 are *131 not barred by the statute of limitations. The conclusion that $1,175 of the Club's income for 1951 was received by and is taxable to Grant is based upon the following facts and considerations: There is an entry in the monthly summary record of the Club for cash receipts and disbursements during September 1951 of a "loan" in the amount of $1,175, for which no explanation is recorded in either the daily cash book or the monthly summary book; there is no notation of the name of the recipient of a loan; and no note was held by the Club for the alleged loan. There has not been any repayment of any part of the amount and no interest has been paid to the Club. This item was questioned by respondent's agents during their investigation. In a sworn statement given to the agents, McGowan stated that it was his recollection that Grant told him that he was making a loan of the above amount to his brother. In Grant's sworn statement to the agents he first stated that $1,175 was loaned to his brother, Froddie Grant, but he then changed his statement, denied a loan was made, and stated that the money might have been spent for building improvements, but that he could not explain the entry in the monthly *132 summary book. At the trial of this case, Grant testified that a loan was made to Froddie; that the Club's money was used; and that no approval of the loan was made by the Club's president, but that Finley, Board, and Bragg gave their approval of the loan. Grant's explanation of the alleged loan of $1,175 is not satisfactory; it is uncorroborated; and it is self-serving. Froddie Grant was not called to testify. Petitioner's failure to call Froddie gives rise to an inference, under the circumstances, that Froddie's testimony would have been unfavorable to petitioner. , affd. . Bragg testified that Grant consulted him about making a loan to Froddie to help him open a cleaning business. Bragg's testimony appears to relate to an alleged loan of $11,000 to Froddie made prior to 1950 rather than to the item of $1,175 which is involved. Bragg was vague about both the amount of the purported loan and when it was made. Finley and Board did not corroborate Grant's testimony about the alleged loan. Board was in a sanitarium during 1951. All of the officers of the Club and two trustees testified, in general, that Grant did not *133 consult them about any expenditures. There is no evidence that the Club made a loan to Froddie. If Froddie received the amount, there is a question whether Grant, rather than the Club, made the advance. It cannot be found from the evidence that the Club made a loan in 1951 to any individual. Grant has admitted that he withdrew $1,175 of the Club's funds in 1951. The record as a whole shows that the funds of the Club were under Grant's dominion and control. It must be concluded that Grant withdrew the sum in question for his own use and benefit and that it is properly includible in Grant's income for 1951. We turn now to consideration of the chief question, whether the net income of the Club for the taxable years is taxable to Grant. At the outset, it must be made clear that the question before us arises under section 22(a) which defines gross income as including "gains or profits and income derived from any source whatever." The Club is not before us in this case, and we cannot consider the question whether it is a taxexempt corporation under section 101(9). And it is not necessary to decide whether the corporate entity of the Club should be ignored. However, because of the close relationship *134 of Grant to the Club and his complete control over the management and operations of the Club's activities, it is proper to scrutinize carefully Grant's operations and handling of the Club's receipts and disbursements. Even though the Club is incorporated and is ostensibly a social club which is exempt from corporation income tax, if Grant diverted and reecived all or any part of its net income during the taxable years for his own use and benefit, such income is taxable to him. See , modified ; ; and , affd. . Where a corporation has earnings and there is no evidence that it either retained them or spent them for a business purpose, but there is evidence that those having complete charge of and dominion and control over its funds received funds of the corporation, it has been held that such income of the corporation is taxable to the individuals who received them. , affd. , certiorari denied . Taxation is concerned with realities. If the earnings of a corporation are *135 distributed to an individual who has complete charge of and dominion and control over its funds, such distribution is taxable to the individual who received the earnings even though the corporation is a nonstock corporation, is not able to pay dividends, and the distribution is not recorded on the corporation's books. Cf. , and cases cited; , affirming ; ; , affd. ; and . See, also, , affd. . The respondent determined that the net income of the Club for each of the taxable years is taxable to Grant. His determination is prima facie correct and petitioners have the burden of proving the facts which establish error by a preponderance of the evidence. If they fail to meet their burden of proof, the Commissioner's determination must be sustained. ; ; ; ; *136 . See 9 Mertens, The Law of Federal Income Taxation (1958), sec. 50.61. The evidence shows that Grant was the only person who had access to the Club's safe; only he knew where the receipts from the Club's operations were kept and what happened to them; and only he had the power to make disbursements. Grant had complete charge of and dominion and control over the Club's accumulated and current receipts, and over the Club's books. He was not required to and did not submit financial reports to the officers and directors, or ask for or obtain their approval of expenditures, or their consent to expend funds. Grant testified that the Club's president, McCray, did not have any responsibility for the Club's funds; that he never saw or counted the cash in the treasury (wherever the accumulated and current receipts were kept); that he did not have access to the Club's safe; that he did not have any authority to write checks; and that he never examined the books. McCray was president for 5 or 6 years, 1950-1955. Grant and McCray were old friends. Grant asked him to become president, and he became president. McCray testified that he did not have any *137 duties, other than to sign the annual application for a liquor license; and that he did not ever see the amount of cash in the safe, or have access to the safe, or give Grant permission to spend funds, and that he did not have any control over the Club's funds. McCray testified that he did not give Grant permission to make any loan of the Club's funds. Finley was purportedly the Club's treasurer during 1950-1952. He is a janitor at the Goodyear plant. Finley testified that it was his duty "to help look after the financial affairs" of the Club, but he admitted that he never had any access to the safe of the Club in Grant's office; that Grant never opened the safe to show him how much money was there; and that Grant never asked him individually if money could be spent. He testified that he looked over the books after McGowan had made the monthly summaries and additions of figures; that he did not have any idea about what happened to the Club's profits during 1950-1952; and that he did not ask Grant any questions about what happened to the Club's money. In a sworn statement to a special agent of the respondent, John A. Nehrer, Finley stated that he did not know anything about the financial *138 end of the Club's affairs; that he signed checks for Grant whenever requested and without inquiring about the checks; that Grant handled the Club's funds; and that nobody seemed to "reap any benefits from it [the Club]" besides Grant. Grant did not explain during the trial of this case what he did with the Club's funds; he did not account for their disposition. At the trial, he could suggest only two possibilities: that some of the Club's funds had been loaned to his brother, Froddie; and that some money had been spent in making improvements to the Club. Grant did not produce his own books and records, see , and , or any evidence which would negate the respondent's determination that he had received the net receipts of the Club for the years 1950-1952, which are the only years before the Court. He did not call upon Froddie to give testimony. He did not produce proof of any substantial expenditures made during 1950-1952 for improvements. Upon the entire record, we are unable to believe Grant's testimony that he did not receive all of the net receipts of the Club for each of the years 1950-1952, inclusive. ; *139 It is concluded that Grant has not overcome the presumption of correctness of the respondent's determination that the Club's net income inured to his benefit and constituted his income in the amounts of $11,022.74 for 1950, $14,342.42 for 1951, and $16,094.11 for 1952. The amount, $11,022.74 for 1950, is a net amount after giving effect to the payment in 1950 of an Ohio sales tax deficiency in the amount of $658.38. The amount of the Club's net income for 1951, $14,342.42, includes the sum which it has been held above was withdrawn by Grant, $1,175, which Grant unsatisfactorily claimed was loaned by the Club to Froddie. Upon the whole record the only conclusion which can be made is that Grant received the net earnings of the Club for each year without any restriction as to the disposition thereof and that he was free to use such income as his own. It is held, therefore, that the net income of the Club for the years 1950-1952, in the amounts above stated, is taxable to Grant. The final question is whether the respondent has sustained his burden of proving by clear and convincing proof that part of the deficiency for each year was due to fraud with intent *140 to evade tax. After careful study and analysis of the entire record we are unable to conclude that Grant wilfully failed to report in his income tax returns the net income of the Club for each of the taxable years with fraudulent intent to evade tax. The burden of proof with respect to fraud is upon the respondent. Section 1112. Fraud is never to be presumed; it must be established by the respondent by clear and convincing evidence. , affd. ; ; , affd. . It has been observed before now that "both parties may fail through inadequate proof on their several issues, and thus the deficiency would be sustained and the penalty set aside." . See, also, , affirming and reversing in part a Memorandum Opinion of this . The conclusion is reached that respondent has not sustained his burden of proof notwithstanding we have sustained respondent's determination that the net income of the Club for each year is taxable to petitioner, which conclusion is based upon petitioners' failure *141 to meet their burden. It is well established that the fact that the respondent determined a greater tax liability than was reported and that his determination is sustained does not in itself establish fraud. , affd. sub nom. ; ; , affd. ; Respondent bases his contention of fraud on the failure of Grant to report in his income the net income of the Club. Grant testified that it was his understanding that the income of the Club is not taxable. McGowan testified that he was unaware of the requirement that a corporation claiming to be tax exempt must file an affidavit to that effect with the collector for the district where the corporation is located and annual information returns, form 990, under Regulations 111, section 29.101-1. Having observed both witnesses, it is the Court's opinion that although both Grant and McGowan were extremely negligent, neither one had a fraudulent intent to defraud the Government by calculated tax evasions. ; , *142 reversing . "Negligence, whether slight or great, is not the equivalent to the fraud with intent to evade tax named in the statute." Considering the whole record, it is evident that at some time, many years prior to the taxable years, the Club may have been a purely social club none of the receipts of which inured to the benefit of any individual, and that during the taxable years the Club was a place where individuals gathered for social diversion. There is evidence that to some extent the Club had members other than patrons who paid an admission fee of 10 cents to enter the premises, although the proof relating to this matter is not wholly clear and may be incomplete. Even though petitioners have failed in their burden of proof under the question whether all of the Club's net income inured to the benefit of Grant, the record contains much which supports the view that the Club had some members and was a social club. Since Grant is unable to read readily or understand the meaning of written or printed words, as the Court observed frequently during the trial; since Grant is not acquainted with what is involved in preparing income tax *143 returns and was obliged to have McGowan prepare his returns; and since Grant demonstrated that he had no understanding of the requirements of the applicable Federal income tax law, it is not to be concluded from the entire record that he had a fraudulent intent. Furthermore, we are satisfied that Grant has very little knowledge about the formal requirements for carrying on the affairs of a corporation. Grant freely admitted that he had complete dominion and control over the Club's funds, the safe, and the accounting records, but it is evident that he did not comprehend or understand the inferences to be drawn from his control over the Club's operations and money under rules of Federal tax law. The record shows that Grant sought the assistance of one whom he believed capable of properly assisting him in preparing his returns and that returns were prepared which, according to their understanding, reported the income of petitioners which the law required the petitioners to report, with the exception of some rent which was omitted under the mistaken belief that it had been paid to the Club rather than to petitioners, as had been done in earlier years. We are satisfied that Grant was not *144 able to comprehend, and did not obtain competent advice about, the legal requirements under Federal tax law for reporting the income of the Club, or of handling its affairs and funds so as to meet the conditions prescribed by law for maintaining a tax-exempt status of the Club, if such status existed or could have been established. Negligence, careless indifference, or even disregard of rules and regulations do not suffice to establish fraud. ; ; ; ; . The 50 per cent additions to the deficiencies under section 293(b) are, therefore, set aside. Decision will be entered under Rule 50. Footnotes
*. A discrepancy of 7 cents is not explained. The stipulated amount is $14,342.42.↩
1. Sec. 275(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.↩